UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DYLAN C. JONES,

Petitioner,

v.

WARDEN J. ENGLEMAN,

Respondent.

Case No. 2:22-cv-05292-MCS (GJS)

**AMENDED REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This Amended Report and Recommendation is submitted to United States District Judge Mark C. Scarsi, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California.

## INTRODUCTION

On July 29, 2022, Petitioner, a prisoner in federal custody, filed a habeas petition pursuant to 28 U.S.C. § 2241 [Dkt. 1, "Petition"]. On August 16, 2022, 2021, Respondent filed a combined Answer and Motion to Dismiss the Petition [Dkt. 5, "Motion"], with a supporting Declaration of Maricela Bugarin ("Bugarin Decl.") and Exhibits ("Ex."). On August 25, 2022, Petitioner filed a Reply in response to the Motion [Dkt. 7, "Opposition"]. The matter, thus, is fully briefed, submitted, and ready for decision.

# BACKGROUND

Petitioner is incarcerated at FCI-Terminal Island pursuant to his conviction for importation of methamphetamine and related sentence of 34 months imprisonment and five years of supervised release.  [Bugarin Decl. ¶¶ 4.a – 4.b; Ex. A at 31-32.]  If Petitioner earns all possible remaining good conduct time credits, his projected release date is April 9, 2023.  [*Id.* ¶ 4.c; Ex. A at 31.]

The Petition stems from the First Step Act ("FSA"), a sentencing reform law that was signed into law on December 21, 2018.  Among other things, the FSA enacted amendments to 18 U.S.C. §§ 3621, 3624, and 3632, which require the BOP to afford prisoners the opportunity to participate in "evidence-based recidivism reduction programs" and "productive activities," in turn allowing them to accrue "earned time credit" incentives for completion ("ETCs").  As the Ninth Circuit has described it:

> [P]aragraph 102(b)(1) amends [18 U.S.C.] § 3624 by adding subsection (g), which is relevant to the Act's creation of an earned time credit system.[fn. om.]  [132 Stat.] at 5210-13.  The Act requires that, within 210 days of its enactment, the Attorney General establish a "risk and needs assessment system" to, broadly speaking, review each prisoner's recidivism risk level, award earned time credit as an incentive for participation in recidivism reduction programming, and "determine when a prisoner is ready to transfer into prerelease custody or supervised release in accordance with  section 3624."  § 101(a), 132 Stat. at 5196-97.  Section 3624(g) details the criteria for when a prisoner becomes eligible, considering earned time credit, for transfer to prerelease custody or supervised release.  § 102(b), 132 Stat. at 5210-13.

*Bottinelli v. Salazar*, 929 F.3d 1196, 1197-98 (9th Cir. 2019).  *See also* 18 U.S.C. §§ 3621(h), 3632(a).

The FSA specifies the rate at which federal inmates may earn ETCs.  *See* 18 U.S.C. § 3632(d)(4)(A)(i)-(ii).  The FSA also provides that:

> Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities *shall be applied* toward

2

time in prerelease custody or supervised release.  The Director of the Bureau of Prisons *shall transfer* eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release.

18 U.S.C.  § 3632(d)(4)(C) (emphasis added).  Eligibility for such ETC-fueled release into prerelease custody or supervised release is determined under 18 U.S.C. § 3624(g).  Section 3624(g)(1) spells out the conditions for applying ETCs to effect early release as follows:

(1) **Eligible prisoners**.--This subsection applies in the case of a prisoner (as such term is defined in section 3635) who—

(A) has earned time credits under the risk and needs assessment system developed under subchapter D (referred to in this subsection as the "System") in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment;

(B) has shown through the periodic risk reassessments a demonstrated recidivism risk reduction or has maintained a minimum or low recidivism risk, during the prisoner's term of imprisonment;

(C) has had the remainder of the prisoner's imposed term of imprisonment computed under applicable law; and

(D) (i) in the case of a prisoner being placed in prerelease custody, the prisoner—

(I)   has been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments of the prisoner; or

(II)  has had a petition to be transferred to prerelease custody or supervised release approved by the warden of the prison, after the warden's determination that—

(aa) the prisoner would not be a danger to society if transferred to prerelease custody or supervised release;

(bb) the prisoner has made a good faith effort to lower their recidivism risk through

3

participation in recidivism reduction
programs or productive activities; and

(cc) the prisoner is unlikely to recidivate; or

(ii) in the case of a prisoner being placed in supervised
release, the prisoner has been determined under the
System to be a minimum or low risk to recidivate
pursuant to the last reassessment of the prisoner.

Following the conclusion of the notice and comment period, the BOP issued a regulation effective on January 19, 2022, entitled "Application of FSA Time Credits."  28 C.F.R. § 523.44.  The regulation sets forth various criteria that must exist before the BOP "may apply [ETCs] toward prerelease custody or early transfer to supervised release."  These criteria essentially follow those set forth in Section 3624(g), including that an inmate must have:  earned ETCs in an amount equal to the remainder of his or her imprisonment term; shown through periodic risk assessments "a demonstrated recidivism risk reduction" or "maintained a minimum low recidivism risk during the term of imprisonment"; had the remainder of his or her imprisonment term computed under applicable law; and maintained a minimum or low recidivism risk through his past two assessments and received the Warden's approval to be transferred to prerelease custody or supervised release.  28 C.F.R. § 523.44(b)-(c).

The BOP has not yet issued its Program Statement on how ETCs are to be applied.  In the Motion, Respondent represents that the Program Statement is "forthcoming in the near future," but does not identify when this will be or provide any facts to support that statement.  [Bugarin Decl. ¶ 14.]  Respondent asserts that it "is expected" that the Program Statement will "specify that prisoners with pending charges or detainers cannot apply their ETCs until resolution of the charges or detainers," but again, does not explain why such a provision is expected or any facts to support that conclusion.  [*Id.*]  It appears that Respondent relies on a June 24, 2022 memorandum issued by Catricia Howard, the BOP's Assistant Director for the Correctional Programs Branch, which states, *inter alia*:  "To apply the [ETCs]

4

earned, an inmate must otherwise be eligible to participate in pre-release placement, Therefore, an inmate must not have detainers or unresolved pending charges." [Bugarin Decl. ¶ 14; Ex. I ("Howard Memorandum").]

The Howard Memorandum does not state that its purpose is to convey the contents of the upcoming Program Statement or convey a newly articulated BOP policy, nor does it cite to any statutory or regulatory basis for the above-noted statement.  Rather, the Howard Memorandum states that its purpose is to advise BOP staff of a "new SENTRY tracking method for unresolved pending charges, including criminal, supervised release violations, and unknown immigration status charges."  The Howard Memorandum advises that an automated system to calculate and apply ETCs is being developed and that for this new system to function, detainers and unresolved charges must be tracked in SENTRY.  The Howard Memorandum then describes the "interim process" to be followed to track unresolved pending charges and detainers and how this ultimately will work with the SENTRY system.  Local staff are directed to "audit" inmates and update SENTRY, with a goal of preventing inmates with unresolved pending charges from being awarded ETCs and released early as a result.  The Howard Memorandum contemplates that audits for inmates being released within a year should be completed within 60 to 90 days, and those with later release dates within 90 to 120 days.

Petitioner has criminal charges pending in the State of Missouri in two separate state criminal cases based on domestic assault and other assault charges, one involving felony charges and the other misdemeanor charges.  Both state criminal cases are open at present.  [Bugarin Decl. ¶ 5; Ex. B.]  (Hereafter, the "Missouri criminal cases."]

Petitioner contends that he has received a "low" risk assessment in connection with his FSA-required risk assessment.  He also contends that he has participated in programming that qualifies under the FSA for treatment as ETCs and for which he

has accrued over seven months' worth of ETCs.  [Petition at 3; Opposition at 1 n.1.]
Respondent does not dispute these assertions.  [Motion at 8; Bugarin Decl. ¶¶ 12
and 15, noting that Petitioner is classified as eligible to earn ETCs, has been
assessed as having a low risk of recidivism, and had earned a total of 210 days of
ETCs as of July 30, 2022.]  Nonetheless, the BOP has categorized Petitioner as
ineligible to have his earned ETCs applied to his sentence due to his pending
Missouri criminal cases.  [Bugarin Decl. ¶ 13.]

### PETITIONER'S CLAIM

The gravamen of the Petition is that Petitioner is being wrongly denied early
release from FCI-Terminal Island pursuant to his earned ETCs.  Petitioner alleges
that, but for this wrongful denial, he should be released on supervised release or
prerelease custody as of some unspecified date in August 2022.

Respondent has construed the Petition as raising two claims, with the first
being a claim based on an alleged wrongful denial to Petitioner of the "standard"
nine months off his sentence based on his participation in a BOP Residential Drug
Abuse program ("RDAP").  The parties are in dispute about whether Petitioner
actually has participated in all of the required components of the RDAP he
commenced in October 2021.  Petitioner contends that he "has been consistently
participating in RDAP since October 2021, and his RDAP "class" of approximately
25 prisoners is set to complete the program and graduate in late august 2022.
[Opposition at 2 n.2 and 15.]  Respondent contends that while Petitioner
commenced the RDAP in October 2021, he has not completed it and, in any event,
on January 10, 2022, was notified that he is ineligible for early  RDAP release due
to the pending Missouri criminal cases.  [Bugarin Decl. ¶ 10; *see* Dkt. 8 (corrected
version of Ex. G.]  Respondent also contends that Petitioner's RDAP claim is
administratively unexhausted and not cognizable.

The Court need not resolve any of the above-noted RDAP issues or disputes.

In his Opposition, Petitioner flatly and explicitly denies that he is seeking any relief related to his RDAP participation or that the Petition raises any sort of RDAP-based claim. [Opposition at 2-3.] Petitioner asserts that the only habeas claim he makes is that set forth below, namely, a claim related to his FSA ETCs and the BOP's refusal to apply them to effect an early release to prerelease custody or supervised release. The Court will take Petitioner at his word. Accordingly, the only claim at issue in this case and requiring resolution is the following:

Petitioner argues that he has earned approximately seven months' worth of ETCs, which if applied as required under the FSA, would cause him to be released by the end of August 2022, whether to supervised release or some form of prerelease custody. Petitioner represents that he has met the above-noted eligibility requirements of 18 U.S.C. § 3624(g)(1) and 28 C.F.R. § 523.44, namely, he has earned sufficient ETCs, his risk of recidivism has been assessed and consistently remained at Low, and the BOP has computed the remainder of his term. He asserts that as of January 20, 2022, the BOP and Respondent agreed that he is entitled to have his ETCs applied toward an early release, but that on June 24, 2022, the BOP and Respondent "reversed course" and subsequently told him that no ETCs would be applied to his sentence due to the pending Missouri criminal cases.

Petitioner contends that the "shall be applied" language of the FSA set forth in 18 U.S.C. § 3632(d)(4)(C) is mandatory subject only to the list of disqualifying offenses set forth in 18 U.S.C. § 3632(d)(4)(D) and the preclusion on early release of inmates with final orders of deportation set forth in 18 U.S.C. § 3632(d)(4)(E). Petitioner notes that he is not serving a sentence for a disqualifying offense and has not been ordered to be removed. Petitioner argues that these exceptions show that if Congress had wished to carve out from the mandatory "shall be applied" language of Section 3632(d)(4)(C) another exception – namely, for prisoners with pending state criminal cases or detainers – it could and would have done so.

Petitioner alleges that he will suffer irreparable harm unless the BOP is

required to apply the approximately seven months of ETCs to his sentence that he has earned and therefore release him on either supervised release or prerelease custody.

## DISCUSSION

In the Motion, Respondent attacks the Petition on two relevant grounds.

First, Respondent argues that Petitioner's FSA/ETCs claim should be dismissed without reaching its merits, because Petitioner has not complied with the administrative exhaustion requirement applicable to Section 2241 habeas petitions. With respect to administrative exhaustion, the Petition alleges only that Petitioner has had multiple "communications" with unidentified prison staff relating to his claimed right to an early release under the FSA, but that staff have informed him that the decision (finding him ineligible for early release due to his pending Missouri criminal cases) is final and that he will not receive any ETC-related benefits despite being eligible.  Respondent claims that Petitioner did not invoke the BOP's formal administrative review process (discussed *infra*) until August 2, 2022 – after the Petition was filed.  Petitioner claims, however, that he previously attempted to resolve this dispute with the BOP through informal procedures once he learned that the BOP would not apply ETCs to him and was told that the BOP's decision was "final," and since then, he has not met with success with respect to his efforts to follow the formal administrative review process.  Petitioner contends that, therefore, exhausting his administrative remedies at this juncture would be futile.

Second, Respondent concedes that Petitioner's calculation of the amount of his ETCs is correct and that he would qualify for early release under the FSA but for the pending Missouri criminal cases.  Respondent contends, however, that the decision to find Petitioner ineligible for early release falls within its discretion, because the BOP is entitled to interpret the FSA to allow it to deny application of earned ETCs to those federal inmates who have pending criminal charges or a

detainer, as stated in the Howard Memorandum.  As discussed below, Respondent does not argue that the Howard Memorandum should receive *Chevron* level deference,[1] given that it is not a regulation enacted after notice and comment. Instead, Respondent argues that the statement in the Howard Memorandum at issue – that inmates with pending criminal charges and detainers are ineligible for early released despite their earned ETCs – is entitled to *Skidmore* deference,[2] because the Howard Memorandum constitutes a persuasive interpretation of the FSA provisions set forth in 18 U.S.C. §§ 3632(d)(4)(C) and 3624(g).

## I.    Administrative Exhaustion

For federal prisoners such as Petitioner, the BOP has in place an administrative remedy procedure by which inmates can seek formal review of their complaints regarding any aspect of imprisonment.  Generally, the procedure requires a prisoner to first pursue an informal review of the issue at hand and, if unsuccessful, then pursue a three-step formal administrative remedy process upward through the "final administrative appeal" that renders a claim administratively exhausted.  *See* 28 C.F.R. §§ 542.10-542.19; *Nigro v. Sullivan*, 40 F.3d 990, 992 (9th Cir. 1994).

With respect to administrative exhaustion and Section 2241 petitions:

> Under the doctrine of exhaustion, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed . . . remedy has been exhausted."  *McKart v. United States*, 395 U.S. 185, 193, 89 S. Ct. 1657, 23 L.Ed.2d 194 (1969) (citation and internal quotation marks omitted). Exhaustion can be either statutorily or judicially required.

*Laing v. Ashcroft*, 370 F.3d 994, 997-98 (9th Cir. 2004).

Section 2241 does not contain an exhaustion requirement, and thus,

---

[1]    *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).

[2]    See *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

exhaustion is not a jurisdictional prerequisite.  *Brown v. Rison*, 895 F.2d 533, 535 (9th Cir. 1990).  For prudential reasons, however, federal courts require Section 2241 petitioners to exhaust their administrative remedies prior to seeking habeas relief.  *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012); *see also Singh v. Napolitano*, 649 F.3d 899, 900 (9th Cir. 2011).  Requiring a petitioner to exhaust his administrative remedies aids "judicial review by allowing the appropriate development of a factual record in an expert forum," conserves "the court's time because of the possibility that the relief applied for may be granted at the administrative level," and allows "the administrative agency an opportunity to correct errors occurring in the course of administrative proceedings."  *Ruviwat v. Smith*, 701 F.2d 844, 845 (9th Cir. 1983) (*per curiam*).  Dismissal is appropriate when a federal prisoner has not exhausted the administrative remedies made available by the BOP.  *Martinez v. Roberts*, 804 F.3d 570, 571 (9th Cir. 1986) (*per curiam*).

Courts have discretion to waive the exhaustion requirement when administrative remedies are inadequate or their exercise would be futile, or irreparable injury would result without immediate judicial intervention.  *See, e.g., Ward*, 678 F.3d at 1045; *Laing*, 370 F.3d at 1000; see also *Acevedo-Carranza v. Ashcroft*, 371 F.3d 539, 542 n.3 (9th Cir. 2004).  Although "courts have discretion to waive the exhaustion requirement when prudentially required, this discretion is not unfettered."  *Laing*, 370 F.3d at 998; *see also Murillo v. Mathews*, 588 F.2d 759, 762, n.8 (9th Cir. 1978) ("Although the '(a)pplication of the rule requiring exhaustion is not jurisdictional, but calls for the sound exercise of judicial discretion,' it is not lightly to be disregarded.") (citation omitted).  A "key consideration" in exercising such discretion is whether "'relaxation of the requirement would encourage the deliberate bypass of the administrative scheme.'"  *Laing*, 370 F.3d at 1000 (citation omitted).

The record shows that Petitioner had not completed the BOP's administrative

1    review process with respect to his FSA/ETCs claim before he brought this lawsuit.

2    He does not claim to have done so.[3]  Rather, Petitioner asserts that he has tried to

3    resolve this situation without success and has been told that the BOP's decision is

4    "final."  He argues that therefore, administrative exhaustion would be futile and he

5    would suffer irreparable injury were the Court to hold him to the administrative

6    exhaustion requirement.

7         With respect to the Petitioner's claim of irreparable injury, the Supreme Court

8    has held that "[t]here is no constitutional or inherent right of a convicted person to

9    be conditionally released before the expiration of a valid sentence."  *Greenholtz v.*

10   *Inmates of Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7 (1979) (finding no

11   liberty interest exists in being released prior to sentence expiration); *see also Jacks*

12   *v. Crabtree*, 114 F.3d 983, 986 n.4 (9th Cir. 1997) (finding no due process liberty

13   interest in federal statute relating to one-year sentence reductions for participation in

14   drug programs, because the BOP's denial of such a reduction based on

15   implementing regulation's requirement that the inmate not have been convicted of

16   specified prior violent offenses "merely means that the inmate will have to serve out

17   his sentence as expected").

18        In *Cohen v. United States*, No. 20-CV-10833 (JGK), 2021 WL 1549917, at *4

19   (S.D.N.Y. Apr. 20, 2021), the Court rejected a federal inmate's argument that he

20   would suffer irreparable harm if required to administratively exhaust his claim

21

22   _____

     [3]    Petitioner alleges that: in January 2022, his BOP case manager told him that his ETCs
23   would be applied and he would gain early release as a result; he "only recently learned" that the
     BOP had changed its mind and would not apply his ETCs; he has had numerous discussions about
24   this with his case manager and has been told that the BOP's decision is "final"; he has repeatedly
     used the BOP's "copout" system to request in writing that his ETCs be applied; and in response,
25   his case manager and unit manager met with him and stated that he would not be allowed to apply
     his ETCs.  [Opposition at 12.]  Petitioner also alleges that:  he submitted a BP-8.5 on July 12,
26   2022, asking for reconsideration, but did not receive a response; on August 1, 2022, he submitted
     a BP-9 asking the BOP to reconsider; his counselor told him the BP-9 would not be considered
27   because he supposedly had not submitted a BP-8.5 first; on August 4, 2022, he submitted another
     BP-8.5 asking that his ETCs be applied; and as of the August 25, 2022 date of the Opposition, he
28   has not received a response.  [*Id.*]

regarding the calculation of his FSA ETCs, because "there is no basis to conclude that Mr. Cohen's service of his sentence violates his constitutional rights." *See also Amato v. Pullen*, No. 3:21-cv-01475 (KAD), at 8 (D. Ct. May 10, 2022) (in which petitioner (who had a state criminal detainer) argued he would incur irreparable harm if the ETCs he claimed to have earned were not applied, finding that the exhaustion requirement should not be excused, because "there is no constitutional violation in requiring him to serve his entire sentence").[4]  In *Cohen*, the Court further noted that, "to the extent that Mr. Cohen argues that potential ETCs will be useless to him after he has completed his term of home confinement, he ignores the fact that ETCs can be applied toward time on supervised release and he faces a term of three years of supervised release. See 18 U.S.C. § 3632(d)(4)(C)." 2021 WL 1549917, at *4.  Like Mr. Cohen, Petitioner also faces court-mandated supervised release, in this instance, for five years.  [Bugarin Decl. ¶ 4.a., Ex. A.]  The Court concludes that requiring Petitioner to comply with the administrative exhaustion requirement as to his claim would not result in irreparable harm.

That said, this does not mean that requiring administrative exhaustion in this instance would not harm Petitioner.  This is not a case in which factual questions exist regarding the amount of ETCs Petitioner claims to have accrued or what their effect would be if the BOP were to apply them.  The Petition alleges that Petitioner had accrued approximately seven months' worth of ETCs and Respondent agrees that as of July 30, 2022, Petitioner had "earned a total of 210 days of FSA ETCs" and that "Petitioner's assertion that he has accrued approximately seven months of ETCs as of the date he signed the Petition [July 11, 2022] appears roughly to comport with the BOP's calculation."  [Motion at 8; Bugarin Decl. ¶ 15.]  There is no need to develop an administrative record on this question.  In addition,

---

[4]     The Court notes that in *Amato*, unlike in this case, there were substantial factual disputes about whether the petitioner's participation in programming actually had qualified him to earn the ETCs he claimed to have accrued.

Respondent concedes that, but for the existence of the pending Missouri criminal cases, "Petitioner would be eligible to apply those ETCs once the number of credits equaled the number of days left to serve on his sentence." [Bugarin Decl. ¶ 15; Motion at 8.]  Given the timing involved here – namely, Petitioner's presumptive release date of April 9, 2023, and the by now over seven months of ETCs he has accrued – it seems likely that if Petitioner were to prevail in this action and to have his ETCs applied, he would be entitled to some form of early release either immediately or very shortly thereafter.[5]

The question here, instead, is a purely legal one, *viz.*, may the BOP interpret the FSA to allow it to impose a precondition to ETC application that is not set forth anywhere in the FSA, *i.e.,* that a prisoner be free of pending criminal charges or a detainer?  Put otherwise, this case involves only a statutory interpretation issue divorced from any particular facts relating to Petitioner, not the resolution of any fact unique to him.  There is no need to develop the record through administrative proceedings, because this statutory interpretation question can be resolved without doing so.  Moreover, the BOP's position on the question at hand is clear, both as expressed in the Howard Memorandum and by its arguments set forth in the Motion. Further administrative review proceedings would not clarify the BOP's position, which is that it has the discretion to interpret and implement the FSA in a manner that requires a federal prisoner to be free of pending criminal charges or detainers in order to have the ETCs he or she has earned be applied.

In *McCarthy v. Madigan*, 503 U.S. 140, 145-46 (1992), the Supreme Court succinctly articulated the purposes behind requiring administrative exhaustion, including affording an administrative agency the chance to correct its own error or affording deference to an agency's exercise of its own discretionary power or

---

[5]     In the Opposition (at 1 n.1), Petitioner alleges that, since the July 11, 2022 signature date of the Petition, he now has a total of 230 days of ETCs, which if applied, would entitle him to immediate early release.

producing a useful record for judicial consideration.  These concerns, however, are not implicated in this case, and in any event, as the Supreme Court also made clear, courts may decline to require exhaustion "even where administrative and judicial interests would counsel otherwise."  *Id.* at 146.  Courts must apply an "'intensely practical'" "balancing principle" and decide if the litigant's interest in immediate judicial review might "'outweigh the government's interest in the efficiency or autonomy that the exhaustion doctrine is designed to further.'"  *Id.* (citations omitted.  When the agency involved has predetermined the issue before it, this is a recognized circumstance in which "the interests of the individual weigh heavily against requiring administrative exhaustion."  *Id.* at 146, 148 (citing *Houghton v. Shafer*, 392 U.S. 639, 640 (1968), for the proposition that: "in view of the attorney General's submission that the challenged rules of the prison were 'validly and correctly applied to petitioner,' requiring administrative review through a process culminating with the Attorney General 'would be to demand a futile act'")).  *See also Fraley v. U.S. Bureau of Prisons*, 1 F. 3d 924, 925 (9th Cir. 1993) (per curiam) (waiving exhaustion as futile when the initial request for an administrative remedy was denied based on BOP policy and, therefore, the Regional Director "almost certainly would have denied" a further appeal as well due to that policy).

The Court finds that this is an appropriate instance in which to exercise its discretion to excuse Petitioner's failure to complete the administrative review process before bringing this action, finding that requiring completion of the process before considering the merits of Petitioner's claim would be futile.  The record indicates that Petitioner has not had any success to date with attempting to resolve this issue with the BOP and has been told that the BOP's decision is "final."  It seems virtually certain that Petitioner's claim will be rejected by the BOP upon further administrative review.  Given the timing involved here, this case does not present an instance in which excusing the exhaustion requirement would encourage the deliberate bypass of the administrative process.  The record supports the

conclusion that Petitioner learned of the BOP's reversal of its prior advice that his ETCs would be applied only very recently and that he promptly began efforts at informal resolution, which have failed, before turning to the federal court system. Given Petitioner's April 2023 release date and over seven months of earned ETCs, this is a situation in which a timely resolution is needed for harm to be avoided, even if the situation is not deemed to rise to the level of irreparable injury.

Accordingly, the Court will proceed to the merits of Petitioner's FSA/ETCs claim.

## II.     The FSA/ETCs Claim

The question presented by the Petition is whether the FSA allows the BOP to implement a policy precluding federal prisoners with pending criminal charges or detainers from having their accrued ETCs applied to afford them early release (hereafter, the "Pending Charges Exclusion").  The FSA does not state anywhere explicitly that the BOP may do so, nor does the BOP's recently-finalized implementing regulation (28 C.F.R. § 523.44).  Rather, the Pending Charges Exclusion is set forth in the recent Howard Memorandum, although Respondent asserts that it is "expected" that the Exclusion also will be contained in the BOP's yet to be issued Program Statement.[6]

Respondent concedes that 18 U.S.C. § 3624(g)(1) – which sets forth the requirements for prisoners to be "eligible" to obtain early release under the FSA pursuant to and application of their accrued ETCs – "does not require as a precondition for eligibility that the prisoner be free of a pending criminal charges or detainer against him." [Motion at 16.]  Rather, "it is the BOP's position that such a requirement is salutary." [*Id.*]  Respondent contends that despite Section 3624(g)'s

---

[6]     For argument's sake only, the Court has assumed that the BOP's Program Statement (whenever it issues) will include the Pending Charges Exclusion, but there is no actual competent evidence that this is so.  Respondent's vague assertion that this is "expected" at some unidentified future date is not exactly compelling proof.

specific delineation of what "eligible" means, the FSA "leaves room" for the BOP to exercise its own discretion to determine what constitutes "eligible."  Respondent argues that the BOP may expand Section 3624's eligibility criteria by adding the additional Pending Charges Exclusion precondition, because the second sentence of 18 U.S.C. § 3632(d)(4)(C) requires the BOP to:  (1) determine whether the eligibility criteria of Section 3624(g)(1) are met for a subject prisoner; and (2) then determine between prerelease custody and supervised release as the appropriate form of FSA early release for the prisoner.  [Motion at 15-16.]  In addition, Respondent notes that under the general statute regarding the BOP's inmate placement decisions – 18 U.S.C. § 3621(b) – the BOP is entitled to consider the "nature and circumstances" of the inmate's "offense," which allows it to consider an inmate's pending criminal charges or detainer in making a Section 3621(b) decision regarding an inmate's place of imprisonment, whether in selecting a particular prison initially or when transferring to another prison or in deciding whether prerelease custody is appropriate.  Respondent reasons that, because it can consider pending criminal charges or detainers in making these types of placement decisions under Section 3621(b), and because the FSA statutes also provide for early release, then the FSA's provisions should be deemed to include the same discretion allowed the BOP under Section 3621(b).  [Motion at 16-17.]  Finally, Respondent argues that, at a minimum, the Court must accord *Skidmore* deference to its position set forth in the Howard Memorandum as an informal agency opinion, because it is persuasive.  [Motion at 18-20.]

As this is a case in which an agency's statutory interpretation is in issue, the Court begins, as it must, with the "now-canonical formulation" of the salient questions:

> "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." . . .  First, applying the ordinary tools of statutory construction, the court must determine "whether Congress has directly spoken to the precise question at

16

> issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." . . . But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*City of Arlington, Texas v. Federal Communications Commission*, 569 U.S. 290, 296 (2013) (quoting *Chevron*, 467 U.S. 842-43).

As discussed earlier, federal prisoners who participate in and complete eligible evidence-based recidivism reduction programs and/or productive activities "shall" earn ETCs pursuant to the calculation formula provided in the statute. 18 U.S.C. § 3632(d)(4)(A). Under Section 3632(d)(4)(C), these earned ETCs "shall be applied toward time in prerelease custody or supervised release." The statute does not say "may" be applied or are to be applied in the BOP's discretion, nor does it contain any language that rationally can be read to modify the simple and straightforward "shall be applied" directive. Consistently, the second sentence of the statute states that the BOP "shall transfer" prisoners who are eligible under 18 U.S.C. § 3624(g) into either prerelease custody or supervised release. Again, the statute does not say that the BOP may transfer prisoners in its discretion; the language once again is a mandatory directive. The only discretionary aspect of Section 3632(d)(4)(C) is that the BOP gets to pick which of these two options for early release "shall" be provided to the prisoner in the fulfillment of the BOP's mandatory duty to so transfer a prisoner upon mandatory application of ETCs.

Of course, the FSA's "shall" directives to apply ETCs and transfer an inmate to one of two forms of early release only apply if a prisoner is "eligible" under Section 3624(g), a determination to be made by the BOP. The FSA expressly provides for which prisoners are "ineligible" through Section 3632(d)(4)(D)-(E). This FSA statute denominates "ineligible" prisoners as prisoners who have been <u>convicted</u> of any of the listed federal crimes or who are subject to a final order of removal. There is nothing in this clear language that can be read or stretched to

encompass prisoners who have been charged with, but not yet convicted of, crimes or who have detainers. Indeed, Respondent does not contend that Section 3632(D)-(E) support the Pending Charges Exclusion.

The FSA's delineation of who is an "eligible" prisoner is set forth in Section 3624(g). This FSA statute states that an "eligible" prisoner is one who has: (1) earned ETCs in an amount equal to the remainder of his term; (2) either a demonstrated recidivism risk reduction as shown by periodic risk assessments *or* maintained a minimum or low recidivism risk during his term of imprisonment; (3) had the remainder of his term computed; and (4) if being placed on supervised release, has been determined to be a minimum or low risk to recidivate pursuant to his last reassessment, *or* if being placed in prerelease custody, has been determined to be a minimum or low risk to recidivate pursuant to his last two reassessments or had a petition to be transferred to early release approved by the warden. Some of the Section 3624(g) criteria obviously implicate the BOP's past exercise of its expertise and/or discretion, such as when it has made periodic risk assessments for prisoners over time. There is nothing in Section 3624(g), however, which says or implies that if the BOP *already* has determined that a prisoner is a minimum or low recidivism risk through past periodic risk assessments or otherwise, the BOP then possesses the further discretion to impose a new and additional precondition to early release, namely, that the prisoner presently must be free of pending criminal charges or detainers. Indeed, Section 3624(g) states just the opposite, namely, that the FSA's early release provision, whether through prerelease custody or supervised release, "applies" to a prisoner who has been found to meet the four Section 3524(g) criteria.

In sum, under the clear terms of Section 3632(d)(4)(C), a prisoner who has met the four criteria of Section 3624(g) *is* "eligible" for early release, "shall" have his ETCs applied, and "shall" be transferred to one of two early release options. In *O'Bryan v. Cox*, No. CIV 21-4052, 2021 WL 3932275, at *3 (D. S.D. Sept. 1,

18

2021), the Court examined the above-quoted language of Section 3632(d)(4)(A) and (C) and found that the statutes' use of the word "shall" was mandatory, as in, imposed a duty rather than a grant of discretion.  The Court noted that in the FSA, Congress utilized "both mandatory words and permissive words," and its "intent was clear in each instance." *Id.*  The Court agrees.

The Court notes that several additional matters underscore the mandatory nature of the above FSA language.  <u>First</u>, like the FSA itself, the BOP's implementing regulation – 28 C.F.R. § 523.44 – is bereft of any indication that the BOP possesses the discretion it now claims it possesses to impose an additional precondition on prisoners who seek early release through an application of their ETCs.  That the BOP chose to omit from the regulation any mention of the Pending Charges Exclusion, or anything that nature, is telling.[7]

<u>Second</u>, on January 19, 2022, the BOP issued its final "FSA Time Credits" rule, which "codifies the [BOP's] procedures regarding the earning and application of time credits as authorized by the First Step Act of 2018 (FSA)."  87 Fed. Reg. 2705-01, 2022 WL 159155 (Jan. 19, 2022) ("Final Rule").  The Final Rule prefaces its text by noting that eligible inmates earn ETCs "towards prerelease custody or early transfer to supervised release" and that "[a]s required under the FSA, an inmate cannot earn [ETCs] if that inmate is serving a sentence for a disqualifying

---

[7]       In passing, Respondent asserts that because 28 C.F.R. § 523.44 states that the BOP "may" apply ETCs toward early release if an inmate meets the eligibility criteria of Section 3624(g), this means that the FSA's Section 3624(g) criteria are non-exclusive and the BOP may expand upon them by imposing additional criteria for eligibility not set forth in the statute.  It is unclear why the BOP chose to utilize the term "may" in its implementing regulation related to FSA time credits when the FSA itself repeatedly says that the BOP "shall" apply ETCs and "shall" transfer prisoners to early release.  As discussed herein, the Court has concluded that the FSA does not contain any ambiguity or gap that would afford the BOP the discretion to modify and expand the statutory criteria set forth in Section 3624(g) and to convert the statutory dictate that ETCs "shall be applied" and that the BOP "shall transfer" prisoners to early release to one in which the BOP only need do so if it wishes to.  In any event, nothing in 28 C.F.R. § 523.44 reflects any expansion of the Section 3624(g) eligibility criteria, nor does the regulation add the Pending Charges Exclusion to the criteria to be applied when determining if a prisoner is "eligible" for the application of ETCs.

offense or has a disqualifying prior conviction."  87 Fed. Reg. at 2706.  As with the implementing BOP regulation, no mention is made that inmates who have pending criminal charges or detainers are similarly ineligible – an exclusion from eligibility that plainly would have been a relevant matter to raise if the BOP was considering adding it to the statutory criteria, as it now claims it can do.

At one point, the Final Rule addressed a received comment expressing concern that ETCs would not be applied to supervised release and would be applied only to inmates transferred to prerelease custody.  The BOP explained that under the FSA, ETCs may be applied to both forms of early release.  The BOP then concluded:  "The Bureau assures commenters that [ETCs] will be applied to early transfer to supervised release, as authorized by the FSA in 18 U.S.C. 3632(d)(4)(C) and 18 U.S.C. 3624(g). . . . The Bureau intends to adhere to the parameters of the FSA to permit application of [ETCs] toward transfer to supervised release pending development of policy, in individual cases as appropriate."  87 Fed. Reg. at 2712.  Thus, in the Final Rule, the BOP clearly stated its intent to follow the terms of the FSA by applying ETCs to effect early release.

Even more significant is the BOP's response to a comment received expressing the view that all inmates willing to participate in FSA-compliant programming should earn ETCs and that certain convictions should be removed from the Section 3632(d)(4)(D) listing of ineligible prisoners.  The BOP swiftly rejected that suggestion, noting that "[i]t is outside the [BOP's] authority to alter the exclusions as stated in the FSA" and that "the statutory exclusions may only be amended by Congress."  87 Fed. Reg. at 2713.  In short, in its Final Rule, the BOP plainly recognized and acknowledged that it lacked the authority to modify the FSA's statutorily-designated categories of which prisoners are eligible or ineligible to earn and have ETCs applied so as to result in early release – a position that is directly contrary to that taken here, in which the BOP essentially argues that it possesses an unconstrained discretion to impose additional exclusions not set forth

20

in the FSA when it would be "salutary" to do so.

The Final Rule gave no indication that the BOP believed itself to possess the authority and discretion to impose the Pending Charges Exclusion as a limitation on which prisoners may obtain early release under the FSA.  There is no hint of anything in this respect in the Final Rule and, if anything, the BOP made clear its view that it lacked the "authority" to impose this additional exclusion, stating that only Congress could specify which prisoners are ineligible for ETC-based early release.  Had the BOP actually possessed the view set forth in the Howard Memorandum that it may prevent prisoners from receiving FSA early release based on their pending criminal charges or detainers, it should have so stated in its earlier proposed rule published on November 25, 2020,[8] so as to allow Congress and members of the public the chance to comment on this proposed interpretation of BOP powers under the FSA.  That it did not do so only underscores the unpersuasive nature of its argument here that the FSA's text affords it the authority and discretion to impose additional criteria for eligibility such as the Pending Charges Exclusion.

Third, Respondent's contention – that because the BOP may consider "the nature and circumstance" of an inmate's offense when it makes a Section 3621(b) decision regarding the placement of an inmate, this same discretion exists when it makes FSA early release decisions – only cuts against its arguments here.  Section 3621(b) sets forth a host of factors to be considered by the BOP in making its discretionary inmate placement decisions under that statute – discretionary decisions that, by the statute's terms, are not judicially reviewable.  In marked contrast, Section 3632(d)(4)(C) couches the FSA's early release requirement as a mandatory, nondiscretionary duty – *to wit*, the BOP "shall" apply the prisoner's ETCs and then

---

[8]     Like the Final Rule, the proposed rule promulgated by the BOP contains no reference to prisoners with pending criminal charges or detainers being ineligible for early FSA release.  *See* 85 Fed. Reg. 75268, 2020 WL 6889145 (Nov. 25, 2020).

"shall" transfer the prisoner to one of two forms of early release to be determined by the BOP. Had Congress intended that the BOP's FSA-based early release decisions be governed by and conditioned upon the BOP's discretionary consideration of the multiple factors listed in Section 3621(b), it knew how to do this and could and would have said so. That Congress omitted anything akin to the Section 3621(b) discretionary factors from the pertinent FSA provisions regarding early release indicates that they are not a part of them. Moreover, Section 3632(d)(4)(C) contemplates supervised release as an early release option once ETCs are applied, and Section 3621(b) has nothing to do with supervised release. Why would Congress have meant to afford the BOP with discretion as to one of the two FSA early release options available (prerelease custody) but not the other? There is no tenable reason to believe that it did.[9]

Finally, Respondent argues that it is entitled to decline to apply Petitioner's ETCs because he is a "flight risk" by virtue of the existence of the pending Missouri criminal cases. Given the Court's conclusion that the BOP lacks the ability to refuse to apply ETCs for reasons not articulated in the FSA, this contention fails on its face. It also fails for lack of support, given that Respondent presents no evidence that Petitioner actually is a flight risk, and as Petitioner notes, he has been on a personal recognizance bond in the Missouri criminal cases since his 2018 arrest. [*See* Bugarin Decl., Ex. B at 43, 54.] In any event, as Petitioner further notes,

---

[9]     Respondent also argues that it is entitled to decline to apply Petitioner's ETCs because he is a "flight risk" by virtue of the existence of the pending Missouri criminal cases. Given the Court's conclusion that the BOP lacks the ability to refuse to apply ETCs for reasons not articulated in the FSA, this contention fails on its face. It also fails for lack of support, given that Respondent presents no evidence that Petitioner actually is a flight risk, and as Petitioner notes, he has been on a personal recognizance bond in the Missouri criminal cases since his 2018 arrest. [*See* Bugarin Decl., Ex. B at 43, 54.] In any event, as Petitioner further notes, whether he is released pursuant to FSA early release now or in April 2023, in the regular course of sentence expiration, any such putative flight risk is the same. In either instance, Respondent can do what it does when any prisoner with pending charges or a detainer completes his sentence and is scheduled to be released – notify the authorities from the appropriate jurisdiction that if they wish to take the prisoner into custody, they should do so upon his release.

whether he is released pursuant to FSA early release now or in April 2023, in the regular course of sentence expiration, any such putative flight risk is the same.  In either instance, Respondent can do what it does when any prisoner with pending charges or a detainer completes his sentence and is scheduled to be released – notify the authorities from the appropriate jurisdiction that if they wish to take the prisoner into custody, they should do so upon his release.

When a court is tasked with statutory construction, it is fundamental that "words generally should be 'interpreted as taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute.'" *Wisconsin Cent. Ltd. v. United States*, ___ U.S. ___, 138 S. Ct. 2067, 2074 (2018) (citation omitted). "Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always '"give effect to the unambiguously expressed intent of Congress."'" *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 320 326 (2014) (citations omitted).

Here, there are no such interstices, because the relevant portions of the FSA are not ambiguous or incomplete and Congress's intent is clearly expressed through mandatory statutory language.  The language of the FSA shows that Congress made a conscious choice to do three things.  One, by its use of "shall be applied" and "shall transfer" language in Section 3632(d)(4)(C), Congress made the application of earned ETCs to effect early release mandatory for prisoners "eligible" under Section 3624(g).  Two, by Section 3624(g), Congress spelled out the prerequisites for a prisoner to be "eligible," which have been described earlier and do not contemplate any additional criteria or precondition to release akin to the Pending Charges Exclusion.  Third, by Section 3632(d)(4)(C), Congress explicitly determined which prisoners are "ineligible" to have the FSA's ETC and early release provisions applied to them, and none of these expressly delineated categories include prisoners who have pending charges or detainers.  Had Congress wished to include prisoners with pending charges or detainers among the categories of

prisoners who are "ineligible" under the FSA, it could and would have done so. The Congressional intent expressed through the FSA's mandatory provisions precludes interpreting the pertinent language of the FSA to allow the BOP to impose the additional precondition to early release eligibility contemplated by the Pending Charge Exclusion. Such an interpretation would be contrary to the clear and unambiguous mandatory FSA language that requires application of earned ETCs for eligible prisoners and then transfer to early release.

"[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others," which is "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992). The Court has followed that canon here given the clear wording of the pertinent FSA provisions. "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" "When the words of a statute are unambiguous ... judicial inquiry is complete." *Id.* at 254. When the intent of Congress is clear, as here, there is no need to engage in a further administrative agency deference analysis under *Chevron*. *See City of Arlington, Texas*, 569 U.S. at 296; *O'Bryan*, 2021 WL 3932275, at *4.[10]

The Court notes one final matter. By its terms, the FSA plainly seeks to incentivize prisoners to better prepare themselves for a life outside prison by

---

[10]     The Court need not address, and expresses no opinion on, the merits of Respondent's arguments as to the benefits of and/or justification for allowing the BOP to impose the Pending Charges Exclusion precondition on early release under the FSA. Given its finding of no statutory ambiguity or gap, the Court also need not address the persuasiveness of Respondent's arguments in this respect for purposes of a *Skidmore* deference analysis. There is no doubt that the BOP's arguments about the benefits of the Pending Charges Exclusion reflect its expertise with respect to early release considerations. In enacting the FSA, however, Congress did not leave rooms for the BOP to impose this additional precondition to early release. Given the Court's conclusion that the FSA does not permit the BOP to impose the Pending Charges Exclusion as a precondition to FSA early release for inmates who otherwise would be eligible for such early release, that is the end of the matter under *Chevron* and its progeny, and thus, the reasons why the BOP wishes to impose such an exclusion are not relevant, however meritorious those reasons might be.

participating in and completing those programs and activities that the BOP, in its expertise, has designated as evidence-based recidivism reduction programs and productive activities.  Their reward for doing so, assuming they also have led their prison lives in a manner that leads them to receive low and medium recidivism risk assessments, is knowing that, by its terms, the FSA has told the BOP that it "shall" apply their earned ETCs and "shall" afford them an early release.  Allowing the BOP – on a belated and after-the-fact basis – to purport to write into the FSA statutes a discretion for itself that does not appear therein and to snatch away from prisoners whose efforts have earned them ETC-related benefits not only is unfair but would be contrary to the FSA's goal of incentivizing prisoners to engage in these salutary programs and activities.

Accordingly, the Court concludes that the Petition should be granted.

## RECOMMENDATION

For all of the foregoing reasons, IT IS RECOMMENDED that the Court issue an Order:  (1) accepting this Amended Report and Recommendation; (2) denying the Motion; (3) granting the Petition and directing that, pursuant to 18 U.S.C. § 3632(d)(4)(C) (a) the BOP immediately apply Petitioner's earned ETCs to date to calculate his applicable early release date, (b) thereafter release Petitioner on that early release date pursuant to an appropriate early release option to be determined by the BOP, and (c) if that early release date has passed, to release him within 20 days pursuant to an appropriate early release option to be determined by the BOP; and (4) directing that Judgment be entered accordingly.

DATED:  September 7, 2022

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Reports and Recommendations are not appealable to the United States Court of Appeals for the Ninth Circuit, but may be subject to the right of any party to file objections as provided in the Local Civil Rules for the United States District Court for the Central District of California and review by the United States District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until the District Court enters judgment.